**Howard TERRY et al., Appellants,**

**v.**

**Walter TEACHWORTH et al., Appellees.**

**No. 115.**

Court of Civil Appeals of Texas.

Houston (14th Dist.).

June 19, 1968.

Rehearing Denied Sept. 4, 1968.

Raybourne Thompson, Jr., B. Jeff Crane, Jr., Vinson, Elkins, Weems & Searls, Houston, for appellants.

Will Sears, Sears & Burns, Houston, for appellees.

BARRON, Justice.

This is a suit wherein Walter J. Teachworth and Joseph C. Lampton, as plaintiffs, seek to set aside a trustee's deed to certain property located in Galveston, Texas. They further brought suit to declare the agreement between Howard Terry, Walter

Mischer and the plaintiffs to be usurious, thereby seeking to void the interest provision contained in the deed of trust note executed by the plaintiffs. It was alleged further that defendants, Terry and Mischer, had been in possession of the property, an apartment project and furniture therein, since the date of the allegedly void foreclosure, receiving the rents and revenues therefrom. Plaintiffs prayed for title and possession, cancellation of the trustee's deed; declaration that the loan was usurious and void as to the amount of the interest only, and for an accounting.

The jury returned findings that the substitute trustee had not conducted the foreclosure sale; that the $15,000.00 which defendants charged plaintiffs was intended as interest; that defendants did not act as brokers and did not secure a loan for plaintiffs; and that defendants did not intend to charge usurious interest. In response to plaintiffs' motion, the trial court disregarded the latter finding as being immaterial and sustained plaintiffs' motion for judgment. The judgment awarded title to plaintiffs; declared the purported foreclosure sale void; cancelled the substitute trustee's deed as a cloud on plaintiffs' title; declared that the loan agreement was usurious, void and of no effect for the amount of the interest only; awarded title to the apartment furniture to plaintiffs; required defendants to account to plaintiffs for all sums of money collected as rents and revenues from the apartment project and the apartment furniture with provisions for the credits to be allowed to defendants as mortgagees in possession and to plaintiffs for all net profits received by defendants; for further accounting; and the trial court awarded possession of the property to plaintiffs upon their payment to defendants of the balance due on the principal of the loan, after all credits due plaintiffs had been applied.

The appellants are Terry and Mischer, and the appellees are Teachworth and Lampton. The case has been appealed properly to this court.

Appellants have assigned fourteen points of error, the substance of which is the alleged error of the trial court in submitting to the jury the issue inquiring whether the foreclosure sale was made by the substitute trustee, on grounds of no evidence to sustain the findings of the jury, or that the evidence was insufficient or against the great weight and preponderance of the evidence to sustain such finding; the alleged error in declaring the loan agreement to be usurious; the alleged error in the trial court's disregarding special issue number 8 inquiring as to the intention of appellants to charge usurious interest, and in failing to disregard issue number 4 inquiring whether the $15,000.00 charge was intended as interest on the loan; that there was no evidence to support issue number 4, and alternatively, that the trial court erred in failing to declare a mistrial on grounds of irreconcilable conflict in the findings; and the alleged error in overruling appellants' alternative motion for judgment.

We first discuss the alleged errors in connection with the substitute trustee's public sale of the property under the terms of the deed of trust. It is the claim of appellees that no such sale ever took place as required by law, and the jury made findings which support appellees' position. Douglas F. Pollard was appointed substitute trustee to conduct the sale of the property on December 3, 1963, at the Galveston County Courthouse. On the date of the sale, Sam Sterrett, Jr., who represented South Texas Building Company, a partnership composed of Terry and Mischer, accompanied Mr. Pollard to Galveston. Pollard testified that they arrived at Galveston around noon and shortly thereafter went to the courthouse to conduct the sale. The notice was posted on an open bulletin board. Mr. Pollard, after looking for the notice, took the notice from the board and read it. The sale was conducted, and Mr. Sterrett, on behalf of South Texas Building Company, was the only bidder present. He bid in at the sale for $490,812.37, though there was a dispute as to the exact amount of his bid. At and during the time of the

sale there was considerable construction taking place on 20th Street outside the courthouse. The area of the courthouse doors was partly blocked, and it was difficult to go in and out of the courthouse. Mr. Sterrett and Mr. Pollard had entered by the back door of the courthouse and proceeded to the foyer where the sale was conducted, according to their testimony. Pollard and Sterrett claim the sale was publicly held, and immediately thereafter they left, retracing their steps in entering the courthouse. They testified that the sale was held at 1:20 p.m. on December 3, 1963.

Testifying for the appellees was Sam Pena who was in the general construction business for himself and who was engaged as contractor on the 74-unit apartment project, and S. H. Byerley, who had lived in Texas and was at the time of trial owner of a nursing home in Hot Springs, Arkansas. Byerley was also in the building business in 1963 at Beaumont, and was associated with Joe H. Vickers, who was to make a bid on the property at the trustee's sale on December 3rd. There is evidence in the record indicating that Vickers was financially able to make a substantial bid on the property. Vickers did not testify. The evidence shows that he was deceased at the time of trial. The testimony indicates that Vickers and Byerley met Pena in the rotunda of the courthouse on the date of the alleged sale. Their testimony shows that there was a glassed-in bulletin board on the 20th Street entrance to the courthouse, and according to the appellees' witnesses, they inspected the board to see if the notice that they were looking for was there. They found the notice of sale at that time that morning. Byerley and Pena testified that they were present at the courthouse from about 8:30 a.m. until 4:30 p.m., and that one of the three of them got up from the benches where they were sitting to watch for the sale several times an hour to determine whether the sale was taking place. They kept watch until about 12:00 o'clock. They left for a short time to get a sandwich and came back to resume their watch.

The witnesses testified that they returned at about 1:00 o'clock, went to the bulletin board again and found the notice still on the board. The notice was still there at 2:30 o'clock p.m. Byerley personally continued to stay at the courthouse and continued this watch upon the door until sometime between 4:00 o'clock and 4:30 o'clock p.m. At that time Byerley and Vickers left, and Pena was still at the courthouse when Byerley left. The witnesses testified that they saw no one conduct a trustee's sale on that date, though Pena and Byerley definitely testified that they kept a close watch and would have seen the sale if one had taken place. Pena testified that he read the notice himself, and he identified Mr. Pollard's signature. Pena knew Pollard, the substitute trustee, and looked for him at the courthouse. But he testified that he did not see him on that day. The only person Pena knew and saw at the courthouse was Elmo Johnson, who saw Pena a little before noon on December 3rd in the lobby of the courthouse. He spoke to him and knew why Pena was there. Sometime around 5:00 o'clock p. m., on the same day, Johnson talked with Pena at Johnson's office and was told by Pena that the sale did not take place. At Pena's request, Johnson wrote a letter on December 13, 1963, to Douglas F. Pollard stating that Pena had engaged his firm to represent Pena in matters relating to the Ebbtide Apartment construction project since no one appeared to conduct the sale, and in the letter Johnson referred to the date of sale as *December 5, 1963.* Johnson, however, testified that the date *December 5th* was a clerical error, and that the date should have been December 3rd. He testified that December 3rd was the day he saw Pena at the courthouse.

There was evidence that on December 3, 1963, several execution and trustees' sales were actually held either inside or outside the courthouse door of Galveston County, leading to the conclusion that if Pena and Byerley were present they could have seen or detected those sales. Joe Max Taylor, a captain in the Galveston

County Sheriff's Department with responsibility for the postings or notices on the bulletin board and conducting execution and tax sales, testified that there had never been a glass front on any bulletin board in the old courthouse. The witnesses testifying to other sales on that day were not specific as to times of sale and their testimony was given largely on the basis of recollection, general practice, records and custom. This testimony is, however, fairly convincing. Appellees' witnesses testified that they saw no sales on December 3, 1963. Pollard had been informed that Pena would be present with a bidder for the proposed sale, but the trustee apparently did not look for bidders. Neither did Pollard answer Elmo Johnson's letter concerning Johnson's employment to represent Pena under Pena's claim that no sale had taken place. Byerley was not a party to this suit, and the only interest he had in the case was to help Vickers in his intended bid at the trustee's sale.

The deed of trust required Pollard to sell the property for cash. The bid, however, was on the claimed indebtedness owed to appellants, and the trustee's deed to appellants recited a consideration of $10.00 and other good and valuable considerations. No credits were shown upon the note involved. The note was still in the possession of appellants or under their control when it was introduced in evidence at the trial around October 9, 1967. There was no way to determine the specific amount bid for the property, the note was not marked "paid," and it was never re-delivered to appellees.

■ The above is a brief summary of the testimony concerning the alleged sale under the deed of trust. We have carefully reviewed the testimony and we are of the opinion that we are not authorized to interfere with the findings of the jury to the effect that the sale did not take place on December 3, 1963. There was more than a scintilla of evidence to show that the sale was not conducted. The evidence is sharply conflicting, and though we might not have made such a finding under the evidence, the jury was the fact-finder in this case. We cannot say that their findings were based on no evidence. And we cannot say that the evidence for appellees was insufficient or against the great weight and preponderance of the evidence to sustain such findings. The favorable testimony for appellees is somewhat negative in nature, but there is direct evidence to show that the trustee's notice of sale was still on the bulletin board as late as 2:30 o'clock p.m., though testimony for appellants showed that it was taken off the board at about 1:20 o'clock p. m., when the sale was allegedly conducted. There is much remaining testimony which strengthens appellees' position in this connection, and the inferences are clear enough to sustain the jury's verdict. Continental Bus System, Inc. v. Biggers, 322 S.W.2d 1 (Tex.Civ. App.), writ ref., n. r. e. We cannot substitute our judgment for that of the jury merely because we would have reached a different conclusion on the facts. After careful consideration, we hold the evidence sufficient to sustain the findings.

■■ If the evidence in this case would not entitle the jury to find that a foreclosure sale was not conducted, it would never be necessary for any trustee ever to go to the courthouse to hold a sale, because his assertion that he had gone there could never be challenged. The recitals in the trustee's deed gave rise to a presumption of the validity of the sale, but such presumption is rebuttable. Hart v. Eason, 159 Tex. 375, 321 S.W.2d 574; Slaughter v. Qualls, 139 Tex. 340, 162 S.W.2d 671, 675. It was not appellees' burden to prove their case beyond a reasonable doubt. They were only required to convince the jury by a preponderance of competent evidence that the sale did not take place. Burlington-Rock Island Ry. Co. v. Ellison, 140 Tex. 353, 167 S.W.2d 723; Benoit v. Wilson, 150 Tex. 273, 239 S.W.2d 792.

The trial court held that the interest charges on the obligation and note signed by appellees and Sam Pena and Pena Construc-

tion and Engineering Company exceeded the sum of 10% and were therefore usurious. The note signed by appellees for $475,000.00 was made payable to Howard Terry and Walter Mischer, as partners and doing business as South Texas Building Company, bearing interest at the rate of 6½% per annum, dated December 20, 1962, and was payable on or before August 30, 1963, interest payable monthly as it accrued. The note was extended until September 30, 1963, by agreement of the parties. In order to finance the building project proposed by appellees, appellants borrowed the sum of $475,000.00 from Continental Bank & Trust Company of Houston, Texas, signed and executed their note to said bank with interest at the rate of 6½% per annum, and secured their note to the bank by collateral assignment of the above note from appellees and Pena. Appellants also executed a bond, signed by them only as principals, to the bank, conditioned upon the true performance by appellees and Pena of a Building Loan Agreement between appellants and appellees. The building loan agreement between appellants and appellees and Pena provided that Terry and Mischer were lending $475,000.00 to appellees and Pena, at 6½% interest per annum, secured by a deed of trust on the property involved. Terry and Mischer were to advance money as required by appellees and Pena to cover work and materials in place after the commencement of the work on the building project, and the manner and time of such advances, or "draws" was provided for in the agreement. The building loan agreement was based upon a permanent loan commitment dated November 30, 1962, issued by American National Insurance Company of Galveston, the proceeds of which said loan from American National were to be used to pay for the building improvements and certain other indebtedness and expenses incurred in connection with the completion of the project. The insurance company later refused to close the loan.

The only loan made by Continental Bank and Trust Company was made to Howard Terry and Walter Mischer, appellants, and it is evidenced by their note for $475,000.00 payable to said bank. The only loan made to appellees, Teachworth and Lampton, was made by appellants. It is clear that appellees borrowed the money from Terry and Mischer, appellees, and that they had nothing whatsoever to do with the loan from Continental Bank and Trust Company to appellants. Nevertheless, the loan commitment required appellees to pay an "origination fee" of 1½% to the Continental Bank and Trust Company out of the first funds advanced thereon. The origination fee was in the amount of $7,125.00, was deducted from the first "draw" on the loan made by appellants to appellees and the money was sent to Continental Bank. The $7,125.00 was credited on the loan owed to that bank by Terry and Mischer. The evidence is undisputed on this point.

An instrument signed by Pena Construction and Engineering Corporation and by Sam Pena individually dated December 20, 1962, addressed to appellants, shows that the agreed service fee which appellants were charging to handle this loan was $15,007.52. Appellant Terry admitted that appellants charged $15,000.00 as a "fee" pursuant to an agreement of the parties that appellees and Pena would pay a fee for control and supervision of the loan, including cost and disbursement control and inspection of construction. Appellants contend that the charges made to Teachworth and Lampton were for extraordinary, distinct services rendered in the nature of cost and disbursement control and construction supervision, and that the payments made for such services were made with the complete agreement of all parties. However, an agreement to pay usury is no defense, because usury generally occurs as a result of agreement. The evidence shows that Mrs. Hazel Kerr, the personal secretary of Terry, was responsible for coordinating of functions between the contractor and Mr. Lampton, who approved the contractor's draw, and the building superintendent. William Breauxbaker, a certified public accountant, was employed by Howard Terry

and Walter Mischer as Controller. Breauxbaker prepared various work sheets and costs analysis on the apartment project in question. Horace Ashabranner inspected the job to see that everything that was listed for payment had actually been used on the project. A short time after the beginning of the project, South Texas Building Company actually started issuing checks to the individual sub-contractors. Checks were issued individually to various sub-contractors after a meeting between Terry and Lampton, after which time the checks would be issued upon Lampton's approval directly out of the South Texas Building Company office, and the invoices would be returned to Mr. Pena. After the checks were written, it was necessary to verify that the amounts were correct. Appellants contend that these services afforded Terry and Mischer protection for their security, and that it also afforded appellees protection for their investment. It was also contended that the services performed by Ashabranner, while again done to protect the lender against a possible dishonest contractor, accomplished the identical service for appellees. Ashabranner was regularly employed by appellant Terry as a construction superintendent.

The $15,000.00 was a part of the principal of appellees' draw when Terry drew it from Continental Bank and Trust Company, and it was paid out of the construction loan to South Texas Building Company. The regular interest of 6½% was paid out of the principal of the loan to appellees as the job progressed and was added on and charged as part of the principal of the draw. Appellants paid their own interest to the bank. The total interest at 6½% charged on the loan was approximately $16,800.00.

The "origination fee" in the sum of $7,125.00 plus the fee for alleged extraordinary services in the sum of $15,000.00 makes a total of $22,125.00 which appellees paid to appellants over and above the regular interest at the rate of 6½% per annum.

The fee for a so-called performance bond cannot lawfully be correctly charged to appellees, since the bond was a personal one made by appellants to their lender, Continental Bank and Trust Company. Just why the bond was made is not shown. There were no sureties on the bond, and the note signed by appellants to the bank should have fulfilled any and all purposes under the circumstances so far as liability of appellants to the bank is concerned.

The jury found as a fact that the $15,000.00 charged by appellants to appellees was intended as interest on the loan. The testimony concerning the $7,125.00 origination fee is undisputed. We think it is clear that the interest agreed upon and actually charged to appellees exceeds the statutory limit of 10% and is usurious. The documentary evidence, the testimony of Terry and the testimony of the witness Verner, all establish that the only loan made by Continental Bank and Trust Company was made to Terry and Mischer and not to appellees. The findings of the jury in answer to special issue number 5, and the undisputed evidence alike, establish that Terry and Mischer were not acting as brokers in connection with this loan.

We believe the jury was properly instructed by the trial court to make findings upon the issue of whether or not the $15,000.00 was to be regarded as interest. The manner of making the charge, whether the so-called extraordinary services were for the sole benefit of appellants, whether they were for the sole benefit of the appellees, or whether they were for the mutual benefit of all parties was an issue which the jury had the right to determine. The issue was resolved by the jury against appellants, and we are powerless to disturb it. In Greever v. Persky, 140 Tex. 64, 165 S.W. 2d 709, it was held that while an agent or broker may lawfully charge a commission for his services in negotiating a loan with a third party, and such commission will not be taken into consideration in determining whether or not the loan is usurious,

where it is done in good faith and not as a mere cloak to avoid the usury law, such a charge may not be made where the party charging the commission is merely lending his own money. The Court further said:

"Greever relies heavily on the case of McDaniel v. Orr, Tex.Com.App., 30 S.W. 2d 489. However, the facts in that case are clearly distinguishable from the fact in the case at bar. In that case the money was borrowed to construct a building. The debtor, in addition to repaying the principal, paid the creditor $250.00 for 'services.' The creditor pleaded and offered to prove that the $250.00 was paid for services rendered by him to the debtor in connection with the construction of the building. On the other hand, the debtor contended that it was paid as interest for the use of money. This Court simply held that it was a fact issue as to whether the $250.00 was paid for the use of the money or for the alleged extra services in connection with the construction of the building. Admittedly, a lender may, without violating the usury law, make an extra charge for any distinctly separate and additional consideration, a question of fact is raised for the jury."

The Supreme Court further said in Greever:

"The fact that the party had to pledge his credit or collateral with a third party in order to obtain the funds which he himself lends to the borrower does not authorize him to charge the commission in addition to the highest legal rate of interest (citing cases). If he makes the loan himself, whatever trouble or hazard is incurred by him in securing the money from a third party in order to enable him to make the loan is in contemplation of the law fully compensated for by the payment of the lawful rate of interest."

Under the facts in this case, we cannot hold as a matter of law that the extra services performed by appellants'

employees in paying sub-contractors, bookkeeping, inspections and auditing were extraordinary services for the benefit of appellees, and not to be regarded as interest charged on the loan. The jury had the prerogative to view these services as necessary solely for the protection and information of appellants, and that the $15,000.00 was actually an interest charge. Also there are other circumstances raising the issue. See Trinity Fire Ins. Co. v. Kerrville Hotel Co., 129 Tex. 310, 103 S.W.2d 121, 127, 110 A.L.R. 442; 3 Baylor L.Rev. 75; Moser v. John F. Buckner & Sons, 292 S.W. 2d 668 (Tex.Civ.App.), writ ref., n. r. e.; A. B. Lewis Co. v. National Invest. Corp. of Houston, 421 S.W.2d 723, 729 (Tex.Civ. App.), writ ref., n. r. e. Further a charge or a deduction in the making of a loan to pay to so-called commission or brokerage is nothing but a device for the collection of additional interest, where the charge is made by the lender himself. Adleson v. B. F. Dittmar Co., 124 Tex. 564, 80 S.W.2d 939; Baltimore Trust Co. v. Sanders, 105 S.W.2d 710 (Tex.Civ.App.), writ dismd.; Eastern Mortgage & Securities Co. v. Collins, 118 S.W.2d 479 (Tex. Civ.App.), writ ref.

Appellants contend that the trial court was required to declare a mistrial by reason of the fact that the jury answered that the $15,000.00 was intended by the parties as interest, but answered in special issue number 8 that appellants did not intend to charge usurious interest. Special issue number 8 is as follows:

"Do you find from a preponderance of the evidence that Howard Terry and Walter Mischer intended to charge usurious interest?"

Answer: "We do not."

"You are instructed that by the term 'usurious interest' is meant the compensation for the use or forbearance or detention of money in excess of ten per cent per year."

However, it is clear that more than 10% had been charged to appellees on the loan if special issue number 4 is given any effect. In Sledge v. Murphy, 284 S.W.2d 938 (Tex.Civ.App.), no writ, citing Donoghue v. State, 211 S.W.2d 623, 629 (Tex. Civ.App.), writ ref., n. r. e., the court said:

" 'Smith's motives had nothing to do with the validity or legal effect of the transaction, and could not have been successfully urged as a defense to defeat enforcement of the obligations he had incurred therein.' Here we have a transaction between appellant and appellee and the evidence is without dispute that appellee was charged (totally) more than the legal rate, so whether appellant did or did not intend to charge usurious interest would be of no effect under the plain letter of the statute." (Parenthesis added).

■ The court held that the result of usury followed regardless of the intent on the part of appellants. In Federal Mortgage Co. v. State Nat'l. Bank of Corsicana, 254 S.W. 1002, 1006 (Tex.Civ.App.), writ dismd., it was held that no question of intent as an ultimate issue was raised, and the result followed regardless of general intent. See also Kollman v. Hunnicutt, 385 S.W.2d 600 (Tex.Civ.App.), no writ; Campbell v. Oskey, 239 S.W. 332 (Tex. Civ.App.), no writ. In view of the finding of the jury upon special issue number 4 to the effect that the $15,000.00 was intended as interest on the loan, an ultimate issue, we believe the finding of the jury upon special issue number 8 inquiring whether appellants intended to charge usurious interest generally is of no force or effect. It is the duty of the courts to reconcile apparent conflicts in jury findings if that can reasonably be done, and a conflict in jury findings will not prevent the rendition of judgment and require a mistrial unless the findings, considered separately and taken as true, would compel the rendition of different judgments. Texas & Pacific Ry. Co. v. Snider, 159 Tex. 380, 321 S.W.2d

280, 282. We believe that special issue number 8 is immaterial in any event, especially in the face of the finding in special issue number 4 inquiring specifically whether the $15,000.00 was intended as interest on the loan. Appellants' *intent* to charge usurious interest was without legal effect under the circumstances. The legal consequences were fixed by the jury's answer to issue number 4 regardless of intent. The trial court correctly disregarded the issue on appellees' motion. American Mut. Liability Ins. Co. v. Parker, 144 Tex. 453, 191 S.W.2d 844, 848; Leggio v. Millers Nat'l. Ins. Co., Tex.Civ.App., 398 S.W.2d 607, 612, writ ref., n. r. e. See also C. & R. Transport, Inc. v. Campbell, 406 S.W.2d 191, 194 (Tex.Sup.). Further, we overrule appellants' contention that special issue number 4 must be disregarded on the claimed ground that it is only evidentiary and without support in the evidence.

■ Appellants contend that the disclaimer of intent to charge usurious interest contained in the deed of trust on the property in question saves this transaction from the taint of usury. But appellants cannot charge usurious interest and then escape the penalties by disclaiming an intention to do what they had plainly done. In Nevels v. Harris, 129 Tex. 190, 102 S.W. 2d 1046, it was said:

"Of course we do not mean to hold that a person may exact from a borrower a contract that is usurious under its terms, and then relieve himself of the pains and penalties visited by law upon such an act by merely writing into the contract a disclaimer of any intention to do that which under his contract he has plainly done."

See also Temple Trust Co. v. Sewell, 133 Tex. 417, 126 S.W.2d 943, where there was no disclaimer clause but where the usurious charges appeared to be a part of the principal. If such a disclaimer clause were given full effect under this record, the usury laws would become meaningless. We overrule such contention.

Appellants have taken the absolute position that a lender may charge the reasonable value of extraordinary services provided by him, and such amount received in payment therefor is not and cannot be interest. We have carefully considered the authorities cited by appellants, including C. C. Slaughter Co. v. Eller, 196 S.W. 704 (Tex.Civ.App.), writ ref.; Federal Mortgage Co. v. Davis, 100 S.W.2d 717 (Tex. Civ.App.), aff'd., 131 Tex. 46, 111 S.W.2d 1066; Hance Hardware Co. v. Denbigh Hall, Inc., 17 Del.Ch. 234, 152 A. 130; Bankers Trust Co. of Detroit v. Cowhey, 243 Mich. 353, 220 N.W. 732; Portland Trust Co. v. Havely, 36 Or. 234, 59 P. 466 and other cases. But the findings of the jury in this case upon what we believe to be proper issues of fact raised by the testimony in this record distinguish those cases. We feel bound to respect the controlling jury findings and we believe the evidence is ample to support them.

We have considered each contention made by appellants, and finding no reversible error, the judgment of the trial court is affirmed.

On Motion for Rehearing

Appellants assert on motion for rehearing that we have considered findings as to other issues in our upholding the trial court's right to ignore the jury's finding in connection with Special Issue No. 8.

It was not our intention to consider any other finding of the jury. We have not chosen to use one special issue to find that another special issue is immaterial. What we have held and now hold is that the jury's answer to special issue number 8 is immaterial, and that the trial court had the right to disregard it without consideration of any other finding. See C. & R. Transport, Inc. v. Campbell, 406 S.W.2d 191, 194–195 (Tex.Sup.).

Appellants' motion for rehearing is overruled.